IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RANDY L. NYMAN,           :   Case No.: 4:04cv2651
                                  :
         Plaintiff           :   Judge Jones
                                    :
         v                  :
                                    :
LIBERTY MUTUAL ASSURANCE    :
COMPANY OF BOSTON,         :
                                    :
         Defendant        :

## MEMORANDUM AND ORDER

September 7, 2005

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

Pending before the Court is a Motion for Summary Judgment (doc. 21) filed by the defendant, Liberty Life Assurance Company of Boston ("Defendant" or "Liberty Life") on June 1, 2005.  We also have before us a Motion for Partial Summary Judgment (doc. 24) filed by the plaintiff, Randy Nyman ("Plaintiff" or "Nyman") on June 1, 2005.

For the reasons that follow, we will grant Defendant's Motion for Summary Judgment in its entirety and dismiss this case.

**PROCEDURAL HISTORY:**

On or about November 3, 2004 Plaintiff filed a complaint against "Liberty

1

Mutual Assurance Company" in the Court of Common Pleas of Centre County,

Pennsylvania.  On December 8, 2004, Liberty Life filed a Notice of Removal in the

United States District Court for the Middle District of Pennsylvania.  (See Rec.

Doc. 1).   On February 23, 2005, Plaintiff filed an amended complaint correctly

naming the defendant to be "Liberty Mutual Assurance Company of Boston."  (See

Rec. Doc. 11).  Although the amended complaint does not refer to or cite the

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, it

asserts a claim for long-term disability benefits ("LTD benefits") under the Coca-

Cola LTD Policy.  We will therefore construe Plaintiff's amended complaint as

arising under the provisions of ERISA.

    On June 1, 2005, both parties filed Motions for Summary Judgment, which

have been briefed by the parties.  The instant Motions are therefore ripe for

disposition.

## STANDARD OF REVIEW:

    Summary judgment is appropriate if "there is no genuine issue as to any

material fact and . . . the moving party is entitled to judgment as a matter of law."

FED .R. CIV. P.  56(c); see also Turner v. Schering-Plough Corp., 901 F.2d 335,

340 (3d Cir. 1990).  The party moving for summary judgment bears the burden of

showing "there is no genuine issue for trial."  Young v. Quinlan, 960 F.2d 351, 357

(3d Cir. 1992).  Summary judgment should not be granted when there is a

disagreement about the facts or the proper inferences which a fact finder could

draw from them.  Peterson v. Lehigh Valley Dist. Council, 676 F.2d 81, 84 (3d Cir.

1982).

Initially, the moving party has a burden of demonstrating the absence of a

genuine issue of material fact.  Celotex Corporation v. Catrett, 477 U.S. 317, 323

(1986).  This may be met by the moving party pointing out to the court that there is

an absence of evidence to support an essential element as to which the non-moving

party will bear the burden of proof at trial.  Id. at 325.

Federal Rule of Civil Procedure 56 provides that, where such a motion is

made and properly supported, the non-moving party must then show by affidavits,

pleadings, depositions, answers to interrogatories, and admissions on file, that

there is a genuine issue for trial.  FED. R. CIV. P. 56(e).  The United States Supreme

Court has commented that this requirement is tantamount to the non-moving party

making a sufficient showing as to the essential elements of their case that a

reasonable jury could find in its favor.  Celotex Corp., 477 U.S. at 322-23.

It is important to note that "the non-moving party cannot rely upon

conclusory allegations in its pleadings or in memoranda and briefs to establish a

genuine issue of material fact."  Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 511

3

(3d Cir. 1994) (citation omitted).  However, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) (citations omitted).

Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)(emphasis in original).  "As to materiality, the substantive law will identify which facts are material."  Id. at 248. A dispute is considered to be genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

## STATEMENT OF RELEVANT FACTS:

We initially note that we will, where necessary, view the facts and all inferences to be drawn therefrom, in the light most favorable to the nonmoving party in our analysis of the pending Motions.

Liberty Life provides LTD insurance to employees of The Coca-Cola Company ("Coca-Cola") and affiliated entities pursuant to a Group Disability Income Policy ("Coca-Cola LTD Policy") which was effective January 1, 2003.

Plaintiff was a participant in the Coca-Cola LTD Policy as a result of his employment with CCDA Waters Company, a Coca-Cola bottling plant in Milesburg, Pennsylvania.  Plaintiff was employed as an industrial operator for the manufacturing department of the Coca-Cola bottling plant.  Deductions were taken from Plaintiff's pay and his employer was responsible for paying the insurance premium for this disability insurance policy with Liberty Life.

In July 2003, Plaintiff injured his lower back while building a chicken coop at his home.  He consulted with his chiropractor without relief and was referred to his treating physician's assistant, John C. Wadsworth ("Mr. Wadsworth").  Mr. Wadsworth prescribed medication for muscle spasms and referred Plaintiff to physical therapy.  Plaintiff attempted physical therapy without improvement and he experienced pain radiating down his legs with his legs becoming weak with prolonged standing.  An August 4, 2003, an MRI of Plaintiff's lumbar spine revealed the following: disc desiccation of L3-L4, L4-L5, and L5-S1; a small broad based central disc protrusion of L5-S1, minimal annular bulge of L3-L4 and L4-L5, and a small annular fissure at the L3-L4 level.  On October 9, 2003, Plaintiff followed up with neurosurgeon Gail Magid ("Dr. Magid") and was ruled out as a surgical candidate.

In December 2003, Plaintiff sought to return to his work with CCDA

Waters; however, Plaintiff's employer insisted upon an examination by Dr. Susan

R. Friedman ("Dr. Friedman") before Plaintiff was allowed to return to work.  On

December 10, 2003, Dr. Friedman examined Plaintiff and recommended the

following:

> His mechanical back problems, which in my opinion are the primary
> cause of his low back pain, should resolve with appropriate physical
> therapy treatment.  Should Mr. Nyman wish, I could give him
> suggestions about where to go, etc.
>
> At present, I would not recommend that he return to his regular job.  I
> think the chances are high that his pain would increase and that his
> employment would be responsible for exacerbation of his underlying
> back problem.

Rec. Doc. 28, P-1, at LL-0084-0087; Rec. Doc. 27, Ex. 29, at LL-0087.

In May 2004, Plaintiff applied for LTD benefits with Liberty Life under the

Coca-Cola LTD Policy.  Both parties agree that Liberty Life received the following

information:[1] an unsigned disability claim form that Liberty Life asserts was

presumably completed by Plaintiff; an Attending Physician's Statement and a

Functional Capacities Form, both of which were completed on May 7, 2004 by Dr.

Henry Dietrich ("Dr. Dietrich"); and an Employer's Statement completed on May

20, 2004, by a representative of Plaintiff's employer.  According to the information

---

[1] The Court notes that Plaintiff's Response to Defendant's Statement of Undisputed
Material Facts in support of the Motion for Summary Judgment states that Liberty Life's
recitation of the information it received regarding the LTD claim is "admitted."  (See Rec. Doc.
32 at ¶ 3; see also Rec. Doc. 22 at ¶ 3).

received by Liberty Life, in July 2003, Plaintiff commenced a medical leave from his position as an industrial operator as a result of his back injury sustained during the same month.  Plaintiff listed the date of his disability as July 8, 2003 and his employer listed Plaintiff's last day of work as July 25, 2003.

On May 7, 2004, Liberty Life received a copy of a job description from Plaintiff's employer concerning his position as an industrial operator.  According to the job description received by Liberty Life, the physical requirements concerning Plaintiff's position require the ability to lift up to 50 pounds occasionally, and require Plaintiff to stand, bend, and squat on a regular basis.  Upon receiving the job description from Plaintiff's employer, Liberty Life referred that information to Liberty Life's Vocational Case Management Department for review.  On June 11, 2004, Janette Purtell ("Ms. Purtell"), a vocational case manager for Liberty Life, prepared an occupational analysis of Nyman.

Prior to receiving Ms. Purtell's occupational analysis, on May 28, 2004, Liberty Life sent letters to various physicians and medical providers who had been identified by Nyman, requesting that they provide medical information, medical records, and other information concerning Nyman's condition.  In addition to receiving medical records, Liberty Life also received additional information from Nyman concerning his claim for benefits under the Coca-Cola LTD Policy,

7

including a questionnaire completed by Nyman on June 10, 2004 in which he

provided information concerning some of his daily activities and physical

capacities.  In the questionnaire, Plaintiff indicated that he was capable of sitting

for approximately one hour, standing for one hour, and walking one and one-half

to two hours.  (See Rec. Doc. 28, P-1, at LL-0172).  Plaintiff also stated that he

was not able to stand or lift objects, kneel or crouch, and that the aforementioned

actions caused pain and discomfort in his back.  Id. at LL-0174.

On June 20, 2004, the disability case manager, Chandra E. Burch ("Ms.

Burch") directed Andrea Dukes ("Ms. Dukes"), the claims handler, to investigate

how Plaintiff's performance at work had been prior to disability and whether he

was having any difficulty doing his work given his physical condition.

Following receipt of the various medical records and other information

concerning Plaintiff's claim, on June 28, 2004, Liberty Life referred Plaintiff's

records for a peer review analysis by an orthopedic specialist, listing questions and

issues to be addressed in connection with this review.  On July 14, 2004, Liberty

Life received a report summarizing the results of the peer review analysis which

had been performed by Dr. Richard Silver ("Dr. Silver"), a board certified

orthopedic surgeon.  Dr. Silver's report stated that Nyman was capable of being

employed in his occupation as early as December 1, 2003, and that there were no

objective clinical findings which substantiated Nyman's subjective complaints of

back pain.  (<u>See</u> Rec. Doc. 27, Ex. 23, at LL-0098-0101).

On July 21, 2004, Liberty Life issued its determination denying Nyman's

claim for LTD benefits under the Coca-Cola LTD Policy.  In addition to describing

the information on which its determination was based, Liberty Life's July 21, 2004

letter advised Nyman of his right to request a review of Liberty Life's

determination and denial of benefits, as well as the procedures to be followed in

connection with any request for review.  Liberty Life received an August 24, 2004

letter from counsel for Nyman which Liberty Life treated as a request for review of

its July 21, 2004 decision.  Nyman therefore appealed Liberty Life's denial of LTD

benefits and supplemented the administrative record with additional information.

As a result of Plaintiff's request for review, Liberty Life referred Plaintiff's file to

Dr. Gale Brown ("Dr. Brown"), one of Liberty Life's consulting physicians who

specializes in physical medicine and rehabilitation.  On October 5, 2004, Liberty

Life received a memorandum from Dr. Gale Brown ("Dr. Brown"), one of its

consulting physicians who specializes in physical medicine and rehabilitation,

summarizing the results of her review of Nyman's medical records.  In her

memorandum, which we will describe in more detail below, Dr. Gale

recommended certain prophylactic physical restrictions but she stated that within

the restrictions, Nyman retained the physical capacity to resume the essential duties of his own occupation as of January 22, 2004.  "Dr. Freedman's opinion that the claimant should not resume his regular job duties is not supported by documentation of standard criteria for neuromuscular impairment."  (Rec. Doc. 27, Ex. 30, Rec. Doc. 28, P-1, at LL-0062).  On October 6, 2004, Liberty Life denied Plaintiff's appeal.

## DISCUSSION:

In its Motion for Summary Judgment, Liberty Life submits that the proper standard of review to employ in the case <u>sub judice</u> is that of "heightened" arbitrary and capricious as Liberty Life is responsible for both determining benefit eligibility and for paying those benefits out of its own funds.  Second, Liberty Life argues that no evidentiary basis exists for disturbing its determination that Nyman was capable of performing the material duties of his industrial operator position.  Finally, Liberty Life contends that Nyman cannot establish that its adverse determination was arbitrary and capricious.

In his Motion for Partial Summary Judgment, Plaintiff is in agreement with Liberty Life that a "heightened" arbitrary and capricious standard of review is applicable; however, he asserts that numerous procedural irregularities warrant elevating the scrutiny under the heightened arbitrary and capricious standard.  "For

the defendant to reject the opinions of the only two physicians who have examined Mr. Nyman and his individual work capacity, without reason or explanation, warrants a high level of scrutiny of the defendant's denial."  (Pl.'s Br. Supp. Mot. Partial Summ. J. at 26).  Plaintiff also maintains that under a high level of scrutiny, Liberty Life acted arbitrarily and capriciously in denying his claim for benefits. "For the defendant to deny benefits to the plaintiff in light of the nature of the physical requirements of his occupation, the recommendations and opinions of two separate physicians and the defendant's own analysis of Mr. Nyman's job was to act arbitrarily and capriciously under the heightened standard of review." Id. at 29-30.

In an ERISA action, a district court must first determine the applicable standard of review and then proceed to evaluate the facts in light of that standard. Accordingly, we will first turn to the issue of the proper standard of review.

## A.   **Applicable Standard of Review**

Under ERISA, a court reviewing an administrator's decision to deny benefits is by default reviewed *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine the employee's eligibility or construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Stratton v. E.I. DuPont De Nemours & Co., 363 F.3d 250, 253 (3d Cir.

11

2004).  If a plan provides discretionary authority to the administrator or fiduciary, then a reviewing court applies a form of arbitrary and capricious review.  Firestone Tire & Rubber Co., 489 U.S. at 111-12, 115; see Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 (3d Cir. 1997).  Discretionary authority can be provided for by express or implied language in the benefit plan.  Luby v. Teamsters Health, Welfare, & Pension Trust, 944 F.2d 1176, 1180 (3d Cir. 1991).  Whether that arbitrary and capricious review is heightened in any way depends on the presence of potentially conflicted ERISA fiduciaries and is determined on a sliding scale that we will discuss in further detail below.  Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 379 (3d Cir. 2000).

The scope of discovery depends upon the standard of review.  In the Third Circuit, "a district court exercising de novo review over an ERISA determination between beneficiary claimants is not limited to the evidence before the Fund's Administrator."  Luby, 944 F.2d at 1184-85.  In sharp contrast, the record available to a court conducting an arbitrary and capricious review is the record made before the plan administrator, which cannot be supplemented during litigation.  See Kosiba v. Merck & Co., 384 F.3d 58, 67 n.5 (3d Cir. 2004)(citing Mitchell, 113 F.3d at 440).  Nevertheless, when a reviewing court is deciding whether to employ the arbitrary and capricious standard or a more heightened standard of review, it

may consider evidence of potential biases and conflicts of interest that are not found in the administrator's record.  Id.

Under the group disability insurance policy, Liberty Life has the authority "in its sole discretion, to construe the terms of [the] policy and to determine benefit eligibility."  (Rec. Doc. 27, Ex. 1, at LL-0033).  As Liberty Life has the discretionary authority to interpret plan terms and determine eligibility for plan benefits, we will review the decision regarding Plaintiff's claim for LTD benefits under the arbitrary and capricious standard of review.  Firestone Tire & Rubber Co., 489 U.S. at 111-12, 115; see Mitchell, 113 F.3d at 437.  In further support thereof, both parties concede that the Court should apply at minimum the arbitrary and capricious standard of review to the case sub judice.  While Liberty Life concedes that the Court should apply the heightened arbitrary and capricious standard of review, the parties have differing views as to the proper "heightened" degree of arbitrary and capricious review along the Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377 (3d Cir. 2000), "sliding scale" approach that is applicable to this case.[2]  As previously noted, we will accordingly review the decision regarding

---

[2] We note that in its brief in support of its Motion, Liberty Life states that for purposes of the instant Motion, it concedes that the Court should apply the Pinto "heightened scrutiny" standard, "without prejudice to its right to argue for application of an even more deferential standard based either on additional factual information or upon subsequent legal developments regarding the appropriate standard of review.  There is currently a conflict among the circuits as to the appropriate standard of review in cases in which an insurance company is both the

Plaintiff's claim for LTD benefits under the arbitrary and capricious standard of review on the basis of the administrative record before Liberty Life at the time of the decision to deny Plaintiff's claim.  See Kosiba, 384 F.3d at 67 n.5 (citing Mitchell, 113 F.3d at 440).

Given the disagreement concerning the application of an elevated standard, we must now determine whether to employ a heightened arbitrary and capricious standard of review, and if so, the proper heightened scrutiny to apply to this case.

In its submissions to the Court, Liberty Life has explained that its role in administering the benefit process under the Coca-Cola LTD Policy includes responsibility for deciding questions concerning benefit eligibility, as well as responsibility for payment of benefits out of its own funds.  In circumstances such as these, the Third Circuit Court of Appeals has applied a "heightened" arbitrary and capricious standard of review, in recognition of the potential conflict of interest which may be present.  See Pinto, 214 F.3d 377.  In Pinto, the Third Circuit held that in reviewing an ERISA plan fiduciary's discretionary determination regarding benefits, a court must take into account the existence of the structural conflict of interest present when a financially interested entity also makes benefit determinations.  See Kosiba, 384 F.3d at 64.  Under this heightened

_____

decisionmaker and funder of disability benefits."  (Def.'s Br. Supp. Mot. Summ. J. at 13, n.1).

14

scrutiny, the Third Circuit adopted a "sliding scale" approach in <u>Pinto</u>, in which the district courts must "consider the nature and degree of apparent conflicts with a view to shaping their arbitrary and capricious review of the benefit determinations of discretionary decisionmakers." <u>Id.</u> (citing <u>Pinto</u>, 214 F.3d at 392-93). The aforementioned "sliding scale method" "intensifies the degree of scrutiny to match the degree of conflict." <u>Id.</u> at 379.

In <u>Pinto</u>, the Third Circuit set out factors for the court to consider in deciding the amount of deference to be afforded to benefit determinations made by insurance companies that both fund and administer plans. The factors a court considers in determining the degree of scrutiny to afford the administrator in the determination to terminate benefits include: "(1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the fiduciary, as the company's financial or structural deterioration might negatively impact the 'presumed desire to maintain employee satisfaction.'" <u>Stratton</u>, 363 F.3d at 254 (citing <u>Pinto</u>, 214 F.3d at 392).

Liberty Life argues that the only factor leading to the application of a heightened level of review is the financial arrangement between the insurer and the company, under which Liberty Life pays benefits out of its own funds. Liberty

Life asserts that the other <u>Pinto</u> factors are either neutral or militate against application of a high level of review.  In response, Plaintiff asserts that numerous procedural irregularities, as previously noted, warrant heightening the scrutiny given to Liberty Life's decision under the heightened arbitrary and capricious standard.[3]

We believe that even under the most heightened arbitrary and capricious standard of review, Liberty Life's decision to deny Nyman disability benefits was proper.  We therefore need not engage in a detailed analysis of specifically how heightened our arbitrary and capricious standard must be and we will apply the least deferential of those standards.  <u>See</u> <u>McElroy v. SmithKline Beecham Health & Welfare Benefits Trust Plan</u>, 340 F.3d 139, 143 n.2 (3d Cir. 2003)(holding that a court may apply a more heightened scrutiny if the same result in favor of the administrator would be reached under a less heightened scrutiny).  Under this

---

[3] In particular, Plaintiff contends that a review of the claims process reveals that: "1) the defendant has engaged in a selective and self-serving analysis of the medical records, relying on portions of the documents that support limiting benefits, while ignoring information from the same sources that support granting benefits; 2) has relied on an inhouse paper medical review to make a determination that Mr. Nyman is capable of performing his job, while at the same time ignoring the opinions of a treating physician and an examining independent medical examination certifying an inability to do his previous job; 3) failed to give weight to [the] conclusion of its vocational expert that Mr. Nyman would be unable to do his job; 4) failed to follow recommendations that an independent medical examination and occupational capacity evaluation be obtained; 5) ignored the conclusions of defendant's employees as to the physical requirements of Mr. Nyman's job; and 6) disregarded the defendant's own investigation which concluded that Mr. Nyman left his employment because he was unable to physically do his job."  (Pl.'s Br. Supp. Mot. Partial Summ. J. at 18-19).

heightened standard, "a plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." <u>Smathers v. Multi-Tool, Inc. / Multi-Plastics, Inc. Employee Health & Welfare Plan</u>, 298 F.3d 191, 199 (3d Cir. 2002).

### B.   <u>Review of Nyman's Claim for Benefits</u>

The Third Circuit Court of Appeals has instructed that in reviewing a denial of benefits under the "arbitrary and capricious" standard, a plan administrator's decision will be overturned only if it is "clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." <u>Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am.</u>, 222 F.3d 123, 129 (3d Cir. 2000)(quoting <u>Abnathya v. Hoffman-La Roche, Inc.</u>, 2 F.3d 40, 41 (3d Cir. 1993)).  The Third Circuit has recently instructed that a court should affirm the plan administrator's determination as long as it is supported by substantial evidence in the record, even if the record also contains substantial evidence that would support a different result. <u>Johnson v. UMWA Health and Retirement Funds</u>, 2005 U.S. App. LEXIS 2115, * 8 (3d Cir. 2005).  "[A] court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." <u>Orvosh</u>, 222 F.3d at

129(internal quotations omitted).  Furthermore, "whether a claim decision is

arbitrary and capricious requires a determination 'whether there was a reasonable

basis for [the administrator's] decision, based upon the facts as known by the

administrator at the time the decision was made.'"  Bader v. RHI Refractories

America, Inc., 111 Fed. Appx. 117, 120-21 (3d Cir. 2004)(quoting Jett v. Blue

Cross & Blue Shield of Ala., Inc., 890 F.2d 1137, 1139 (11th Cir. 1989)).

### i.   The Coca-Cola LTD Policy

In determining whether the decision to deny Plaintiff LTD benefits was

arbitrary and capricious, we begin with the Coca-Cola LTD Policy itself, since an

ERISA plan administrator must "discharge his duties with respect to a plan . . . in

accordance with the documents and instruments governing the plan insofar as such

documents and instruments are consistent with the provisions of [ERISA]."

Mitchell, 113 F.3d at 439; see 29 U.S.C. § 1104(a)(1)(D).

Pursuant to the Coca-Cola LTD Policy, Plaintiff sought benefits pursuant to

the twenty-four (24) month own occupation benefit portion of the Plan.  Under the

Policy, in order for Nyman to be eligible for LTD benefits, his condition must

prevent him from performing the material and substantial duties of his own

occupation during the elimination period and the first twenty-four (24) months of

his alleged disability.[4]  Specifically, the Coca-Cola LTD Policy defines disability

for someone such as Nyman with the twenty-four (24) month own occupation

benefit as follows:

> i.      If the Covered Person is eligible for the 24-Month Own
> Occupation Benefit, "Disability" or "Disabled" means that
> during the Elimination Period and the next 24 months of
> Disability the Covered Person, as a result of Injury or Sickness,
> is unable to perform the Material and Substantial duties of his
> Own Occupation[.]

Rec. Doc. 27, Ex. 1, at LL-0006; Rec. Doc. 28, P-1, at LL-0006.  In addition,

"material and substantial duties" are defined as "responsibilities that are normally

required to perform the cover person's own occupation or any other occupation,

and cannot be easily eliminated or modified."  (See Rec. Doc. 27, Ex. 1, at LL-

0007; Rec. Doc. 28, P-1, at LL-0007).   Therefore, the appropriate inquiry is

whether Nyman's disability, if any, prevented him from doing his job as an

industrial operator.

---

[4] Although not relevant in this case, for disability payments to continue beyond twenty-four (24) months, Nyman must be unable to perform the material and substantial duties of **any** occupation.  (See Rec. Doc. 27, Ex. 1, at LL-0006).

ii.   **Nyman's Record Support**

To determine whether Plaintiff carried her burden, we look to the record as a whole.  See Mitchell, 113 F.3d at 440.  As we previously explained, under the arbitrary and capricious standard of review, the "whole" record consists of that evidence that was before the administrator when the decision being reviewed was made.  Id.; see also Luby, 944 F.2d at 1184, n.8.

Plaintiff presented medical evidence in the form of office notes from his primary care physician, Dr. Dietrich, x-rays taken of Plaintiff's back, an MRI report, physical therapy records, medical records from Mr. Wadsworth, and an office note completed by Dr. Magid following her evaluation of him on October 9, 2003, in support of his claim of disability.  Following Liberty Life's July 21, 2004 denial of Nyman's claims for benefits under the Coca-Cola LTD Policy, Liberty Life received an August 24, 2004 letter from counsel for Nyman which, as previously stated, Liberty Life treated as a request for review of its July 21, 2004 decision and Liberty Life subsequently referred Nyman's file to its Appeals Review Unit.  Nyman's counsel supplemented the prior documentation provided in support of Nyman's claim for disability with the following submissions: a physical capacities evaluation form, which had been completed by Dr. Dietrich on August 3, 2004 and a copy of a December 10, 2003 letter prepared by Dr. Freedman who had

examined Nyman in December 2003 at the request of his employer.

A principal argument advanced by Plaintiff is that Liberty Life acted improperly and arbitrarily in rejecting the opinion expressed by Dr. Dietrich, Plaintiff's primary care physician, concerning his ability to return to his former position.  Plaintiff asserts that one of the procedural irregularities that occurred in the case <u>sub judice</u> concerns the fact that Liberty Life relied upon a paper in-house medical review to reject the certification of a treating physician without explanation.

We find that Liberty Life did not act in an arbitrary and capricious manner in rejecting the opinion of Plaintiff's treating physician, Dr. Dietrich, in favor of contrary opinions expressed by two consulting specialists, for the reasons that follow.

As Liberty Life submits, in <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822 (2003), the Supreme Court noted that ERISA requires that plan procedures "afford a reasonable opportunity . . . for a full and fair review" of dispositions adverse to the claimant.  <u>Id.</u> at 830-31 (<u>citing</u> 29 U.S.C. § 1133(2)). Moreover, the Supreme Court explained that nothing in the Act itself suggests that plan administrators must accord special deference to the opinions of treating physicians.  "Nor does the Act impose a heightened burden of explanation on

administrators when they reject a treating physician's opinion." <u>Id.</u> at 831.  In

<u>Black & Decker</u>, the Supreme Court further stated that plan administrators may not

arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of

a treating physician; however, it held that "courts have no warrant to require

administrators automatically to accord special weight to the opinions of a

claimant's physician; nor may courts impose on plan administrators a discrete

burden of explanation when they credit reliable evidence that conflicts with a

treating physician's evaluation." <u>Id.</u> at 834.

In addition, as Liberty Life points out, following the <u>Black & Decker</u>

decision, district courts have upheld administrative determinations that reject the

opinions of a claimant's treating physicians which are contradicted by opinions

expressed by consulting physicians, even in cases like the instant one, in which the

consulting physicians' opinions are based upon a record review which did not

include an actual examination of the patient.  <u>See</u>, <u>e.g.</u>, <u>Dinote v. United of Omaha</u>

<u>Life Ins. Co.</u>, 331 F.Supp.2d 341, 347-49 (E.D. Pa. 2004); <u>Fahringer v. Paul</u>

<u>Revere Ins. Co.</u>, 317 F.Supp.2d 504, 517-18 (D.N.J. 2003); <u>Sweeney v. Standard</u>

<u>Ins. Co.</u>, 276 F.Supp.2d 388, 396-97 (E.D. Pa. 2003). We therefore reject

Plaintiff's repeated argument regarding the fact that Dr. Dietrich's opinions are

entitled to special weight by Liberty Life.[5]

We will first review the salient portions of Nyman's medical records with Dr. Dietrich to begin our analysis of whether Liberty Life's decision to reject Dr. Dietrich's opinion in favor of contrary opinions received from consulting specialists was arbitrary and capricious.  First, the medical records Liberty Life received from Dr. Dietrich indicate that when Nyman originally strained his back in July 2003, he was seen by Mr. Wadsworth, a physician assistant in Dr. Dietrich's office.  The primary visit diagnosis was a lumbosacral sprain.  Mr. Wadsworth referred Nyman to a physical therapy program on July 14, 2003, which Nyman began on July 21, 2003; however, he voluntarily withdrew from it on July 29, 2003 pending the results of a surgery evaluation by Dr. Magid, the neurosurgery specialist to whom Nyman was referred by Dr. Dietrich. Subsequently, on October 17, 2003, Dr. Dietrich saw Nyman, but not for his back

---

[5] As noted by Liberty Life, it appears that the only post Black & Decker decision cited by Nyman regarding the weight to be accorded treating physician opinions is that of Patton v. Continental Casualty Co., 2005 U.S. Dist. LEXIS 5463 (E.D. Pa. 2005), which is factually distinguishable from the instant case.  In Patton, the United States District Court for the Eastern District of Pennsylvania determined that an insurer had improperly relied upon the opinion expressed by a consulting physician because that physician did not have all available records and information about the claimant's condition before him at the time he rendered his opinion, and did not discuss the contrary opinions expressed by the treating physicians.  Id. at * 29-30.  In this case, there is no assertion that either Dr. Silver or Dr. Brown, Liberty Life's consulting physicians, were rendering opinions based upon incomplete medical records and both of the aforementioned physicians specifically explained why they disagreed with Dr. Dietrich's opinion.

problem.  In fact, as Liberty Life submits, Dr. Dietrich was unfamiliar enough with

Nyman's back injury that on his October 17, 2003 office note concerning his

examination of Nyman for depression, he wrote that Nyman was "currently off

work because of shoulder injury."  (See Rec. Doc. 27, Ex. 15, at LL-0137).  Dr.

Dietrich examined Nyman on January 29, 2004 for his back problem and, as had

occurred with Mr. Wadsworth, referred Nyman for pain therapy.  There is a lack of

evidence that Nyman followed the recommendation to pursue pain therapy, and the

only other office note Liberty Life received from Dr. Dietrich during the

administrative process was that concerning an April 9, 2004 office visit when

Nyman was examined for an upper respiratory infection.  Therefore, Liberty Life

accurately points out that the records demonstrate that Dr. Dietrich saw Nyman for

his back condition on only one occasion, on January 29, 2004, more than three

months prior to his completion of the functional capacities form on May 7, 2004

and more than seven months prior to his completion of the physical capacities form

on August 3, 2004.[6]  At the end of the physical capacities form, Dr. Dietrich wrote

_____

[6] In the functional capacities form, Dr. Dietrich stated that Plaintiff can frequently (1/3 to
2/3 of the time) sit and drive, can occasionally (up to 1/3 of the time) stand, walk, squat, push,
pull, reach, and grasp, and is unable to bend, kneel, and climb.  In addition, the functional
capacities form completed by Dr. Dietrich reveals that Plaintiff can frequently engage in wrist,
elbow, shoulder, and ankle repetitive motions, frequently lift less than 10 pounds and 20 to 30
pounds, can occasionally lift 30 to 40 pounds and 40 to 50 pounds, and is unable to lift over 50
pounds.  (See Rec. Doc. 27, Ex. 4).  The physical capacities evaluation form completed by Dr.
Dietrich on August 3, 2004 indicates that Nyman can sit for 8 hours at one time and sit for 8

24

the following, "I do not think that it will be possible for Mr. Nyman to work on a line twisting and lifting continuously with his back.  There is enough evidence from his MRI that his job at CCDA Waters is out of the question.  He needs to pursue a different type of work."  (See Rec. Doc. 27, Ex. 28).

Our next task in conducting this arbitrary and capricious determination is to scrutinize Liberty Life's consulting physicians' reports.  First, Liberty Life referred Nyman's file to Dr. Silver, an orthopedic surgeon, to ascertain his level of functionality.  Dr. Silver's detailed July 14, 2004 report places particular emphasis on "numerous medical records" submitted from Mr. Wadsworth, Dr. Gabinsky, Nyman's chiropractor, and Dr. Dietrich.  In that regard, after reviewing the aforementioned records, Dr. Silver opined that Nyman had a paucity of objective clinical findings on physical examination to substantiate his subjective complaints and belief that he could not be gainfully employed.  Dr. Silver indicated that the best clinical examination was the neurosurgical consultation performed by Dr.

---

hours during an 8-hour day, stand and walk for 4 hours at a time and during an 8-hour day, continuously (67% to 100%) lift up to 5 pounds and 6-10 pounds, frequently (34% to 66%) lift 11-20 pounds, and occasionally (1%-33%) lift 21-25 pounds, 26-50 pounds, and 51-100 pounds. Additionally, Plaintiff can continuously carry up to 5 pounds, 6-10 pounds, frequently carry 11-20 pounds, 21-25 pounds, and occasionally carry 26-50 pounds, and 51-100 pounds.  Nyman can use his hands for repetitive action such as simple grasping, pushing and pulling of arm controls, and fine manipulation.  Nyman is able to occasionally bend, squat, crawl, climb, and reach, and there are no restrictions of activities invoking unprotected heights, being around moving machinery, exposure to marked changes in temperature and humidity, driving automotive equipment, and exposure to dust, fumes and gases.  Id. at Ex. 28.

Magid on October 9, 2003 in which she recommended a lumbar epidural steroid injection and an intensive course of physical therapy.  She found no focal neurological deficits, decreased range of motion at the extremes of lumbosacral spine, but no loss of functionality of the lumbosacral spine.  While Dr. Silver concluded that Plaintiff should avoid unprotected and unrestricted heights and heavy manual labor, he stated that Plaintiff was capable of being gainfully employed at medium labor and at his normal occupation.  "For a simple sprain/strain, the reasonable timeframe would be a minimum of 4-6 weeks and a maximum of 10-14 weeks.  On rare occasions, it will go as long as 16-20 weeks, but with Mr. Nyman's subjective complaints not being substantiated by objective clinical findings, he has been capable of being gainfully employed as early as 12/01/03, based on my review of the medical records available."  Id. at Ex. 23.

Second, as previously noted, subsequent to Nyman's appeal of Liberty Life's denial of disability benefits, Liberty Life referred Plaintiff's file to Dr. Brown.  In her October 5, 2004 memorandum, Dr. Brown noted that by October 17, 2003, Nyman was reporting no specific low back complaints when he visited his primary care physician, which was consistent with the expected recovery period from an LS strain, such as that experienced by Nyman on July 5, 2003.  Dr. Brown noted that the x-rays completed on August 1, 2003 revealed no change from

previous studies and that the August 4, 2003 MRI did not reveal any significant

changes which correlated with specific symptoms or physical exam findings.

Finally, although Dr. Brown recommended certain prophylactic physical

restrictions,[7] which were consistent with those described by Nyman's primary care

physician and by Dr. Silver in his July 14, 2003 report, Dr. Brown expressed her

overall opinion that Nyman was capable of returning to work in his own

occupation.  (Rec. Doc. 27, Ex. 30).

After a careful review of the record, we do not find that Liberty Life's

decision to reject Dr. Dietrich's opinion in favor of contrary opinions received

from consulting specialists, Dr. Silver and Dr. Brown, was arbitrary and capricious.

Liberty Life's decision to credit the conclusions of Dr. Silver and Dr. Brown over

those expressed by Dr. Dietrich is supported the observations by Dr. Silver and Dr.

Brown that there was no objective medical evidence or documentation supporting

Dr. Dietrich's opinion that Nyman was not capable of returning to his former

position at Coca-Cola.  Moreover, Liberty Life's decision is further buttressed by

an examination of Dr. Dietrich's records, which demonstrate that Nyman had

---

[7] Dr. Brown's prophylactic physical restrictions include the following: "frequent sit/stand/walk with position change every hour as needed; no heavy lift/carry, occasional lift/carry up to 50 pounds; occasional bend/stoop/climb/kneel; avoid repetitive bend/twist in combination; and no restrictions in upper extremity work."  (See Rec. Doc. 27, Ex. 30, at LL-0063).

experienced improvement in his condition by December 2003, and as previously noted, that Dr. Dietrich saw Nyman for his back condition on only one occasion, which occurred more than three months prior to his completion of the functional capacities form on May 7, 2004 and more than seven months prior to his completion of the physical capacities form on August 3, 2004.  Finally, as Liberty Life submits, Dr. Dietrich's medical records confirm that the only "treatment" rendered by him was to refer Nyman to Dr. Magid for a surgical evaluation which led to Dr. Magid's finding that there was no need for surgical intervention, and his referral of Nyman to a physical therapy program, from which Nyman withdrew after a short period of participation.

Plaintiff also places emphasis upon the opinion of Dr. Susan Freedman ("Dr. Freedman"), who was hired by Nyman's employer in connection with Nyman's request to return to work.  Plaintiff argues that Dr. Freedman's "independent" medical examination opinion, stating that employment would exacerbate and cause Nyman further injury, was not followed and that Liberty Life instead again submitted Nyman's case for an in-house medical review.

A thorough review of Dr. Freedman's December 10, 2003 letter reveals that it primarily consists of a summary of Nyman's subjective complaints.  Although she recommended that Plaintiff not return to his regular job and stated that "the

chances are high that his pain would increase and that his employment would be

responsible for exacerbation of his underlying back problem," importantly, Dr.

Freedman did not have access to any of Nyman's medical records, nor did she

examine the x-rays or MRI test result in connection with her examination of

Nyman.  See Stratton, 363 F.3d at 258 (noting it was not arbitrary for a benefits

administrator to be wary of a doctor's opinion rendered before the doctor had an

updated MRI); see Rec. Doc. 27, Ex. 29, at LL-0087; Rec. Doc. 28, P-1, LL-0087.

Instead, Dr. Freedman relied upon Nyman's oral representation of his MRI results.

Finally, and contrary to Nyman's suggestion, Liberty Life did not arbitrarily

disregard Dr. Freedman's opinion.  Dr. Freedman's letter was forwarded by

Liberty Life to Dr. Brown, and Dr. Brown included a detailed summary of her

reasons for discounting Dr. Freedman's opinion.  Notably, Dr. Brown stated the

following in her October 5, 2004 report:

> Dr. Freedman (PM & R) did not offer specific physical restrictions,
> although recommended that the claimant not resume his former job
> due to the risk of mechanical low back pain exacerbation.  However,
> Dr. Freedman did not document neuromuscular impairment to support
> such opinion . . . Dr. Freedman's opinion that the claimant should not
> resume his regular job duties is not supported by documentation of
> standard criteria for neuromuscular impairment.

See Rec. Doc. 27, Ex. 30, at LL-0062-0063.  Liberty Life quoted Dr. Brown's

assessment of Dr. Freedman's letter in Liberty Life's October 6, 2004 letter to

Nyman's attorney explaining the reasons for its adverse decision concerning the appeal.  We therefore do not find that Liberty Life acted arbitrarily and capriciously in rejecting Dr. Freedman's December 10, 2003 letter.

Nyman also argues that Liberty Life did not make its determination based upon an accurate assessment of the principal duties of Plaintiff's position as an industrial operator, which involved regular bending and squatting.  In that regard, Plaintiff contends that if one takes the restrictions and limitations recommended by Defendant's doctors and applies them to the vocational analysis prepared by the vocational case manager, one should conclude that Plaintiff "probably is incapable of doing his job."  (Pl.'s Br. Supp. Mot. Partial Summ. J. at 28-29).

We do not find that Liberty Life acted in an arbitrary and capricious manner in characterizing the principal duties and responsibilities of Nyman's occupation in rendering its decision, for the reasons that follow.  First, Plaintiff is incorrect in contending that Liberty Life acted improperly by not relying exclusively on the job description it received from Nyman's employer, as opposed to the Department of Labor's ("DOL") description obtained from the Dictionary of Occupational Titles ("DOT") by Liberty Life's vocational manager.  Although Nyman cites to Lasser v. Reliance Std. Life Ins. Co., 344 F.3d 381 (3d Cir. 2003), cert. denied, 541 U.S. 1063 (2004), in support of the proposition that a person's "regular occupation" is

generally defined by reference to the actual job duties performed by the specific individual for his former employer, and not on the basis of a more generic job description as to how the occupation is performed in the national economy, the Lasser case is clearly distinguishable from the case sub judice.  In Lasser, the Third Circuit Court of Appeals defined "regular occupation" as "the usual work that the insured is actually performing immediately before the onset of disability," and placed great emphasis on the fact that the disability policy at issue did not define "regular occupation."  Id. at 386 ("In this context, it is unreasonable for Reliance to define 'regular occupation' differently from its plain meaning . . . without explicitly including that different definition in the policy.").  In contrast, the Coca-Cola LTD Policy specifically defines "own occupation" by reference to how a person's occupation is regularly performed in the national economy.  In the Coca-Cola LTD Policy, "own occupation" is defined as follows:

> "**Own Occupation**" means the Covered Person's occupation that he was performing when his Disability or Partial Disability began.  For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy.

Rec. Doc. 27, Ex. 1, at LL-0008; Rec. Doc. 28, P-1, at LL-0008.

Accordingly, we find that because the Coca-Cola LTD Policy explicitly defined "own occupation" by referring to how the occupation is performed in the

national economy, it was appropriate for Liberty Life to include in its consideration the DOT job description, in addition to the description obtained from Coca-Cola. See Vaughan v. Vertex. Inc. Short and Long Term Disability Plan, 2004 U.S. Dist. LEXIS 26061 (E.D. Pa. 2004)(distinguishing Lasser as the policy at issue in Lasser did not include a definition of the term "regular occupation").  Moreover, the administrative record demonstrates that Liberty Life gave consideration to the description of job duties it obtained from Coca-Cola, as well as the DOT job description.[8]

Finally, Plaintiff argues that a procedural irregularity occurred in this case in that the Defendant ignored the conclusions of its vocational case manager, Ms. Purtell, that Nyman could not perform his own occupation and her assessment of the substantial and material duties of Nyman's occupation.  In response, Liberty Life concedes that on the June 11, 2004 occupation analysis completed by its vocational case manager, the case manager stated that "with the capacities recommended by Dr. Dietrich on 5/7/04 [light capacity, with back limitations] it is not expected that claimant could perform his [occupation] as it is typically

---

[8] Contrary to Plaintiff's arguments, we do not find the fact that the Coca-Cola job description states that Nyman's job required him to stand, bend, and squat on a regular basis is inconsistent with the opinions expressed by Dr. Silver and Dr. Brown that he is capable of returning to his position as an industrial operator.  As Liberty Life aptly notes, even the physical capacities evaluation form completed by Dr. Dietrich, Nyman's primary care physician, on August 3, 2004 confirms Nyman's ability to perform these functions, as previously detailed.

conducted in the national economy." (See Rec. Doc. 27, Ex. 20; Rec. Doc. 29, P-1, at LL-0207).

After a thorough review of the record, we are in agreement with Liberty Life's assertion that the above statement written by Ms. Purtell as to whether Nyman could perform his occupation was explicitly premised upon the validity of the restrictions recommended by Dr. Dietrich on the May 7, 2004 functional capacities form. Liberty Life ultimately concluded that the restrictions recommended by Dr. Dietrich were not justified for reasons detailed in the denials of disability benefits. We do not find that Liberty Life failed to accord proper weight to Ms. Purtell's opinion as it was premised upon restrictions that Liberty Life later determined to be invalid or unsupported by medical evidence.

Having reviewed the record as it existed at the time the decision to deny Plaintiff's disability benefits was made, the Court finds that Defendant's decision is proper under the most significantly heightened arbitrary and capricious review standard of review. As previously noted, so long as the administrator's determination is clearly supported by the evidence, we are to affirm its decision. Smathers, 298 F.3d at 199. Here, Defendant's decision to deny Plaintiff LTD benefits is supported by substantial evidence in the record, and without substituting the Court's judgment for that of the Defendant in determining eligibility for plan

33

benefits, the Court concludes that Plaintiff is not "disabled" under the terms of the Coca-Cola LTD Policy and that its decision was neither arbitrary nor capricious.[9] Accordingly, Defendant's Motion for Summary Judgment is granted.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  Plaintiff's Motion for Partial Summary Judgment (doc. 24) is DENIED.

2.  Defendant's Motion for Summary Judgment (doc. 21) is GRANTED.

3.  Plaintiff's complaint is DISMISSED with prejudice.

4.  The Clerk is directed to close the file on this case.

s/ John E. Jones III
John E. Jones III
United States District Judge

---

[9] Plaintiff points out that in Liberty Life's July 21, 2004 denial of LTD benefits, Liberty Life addressed a taxidermy class that Plaintiff completed on April 30, 2004. Liberty Life stated that an occupational analysis determined that the physical demands of a taxidermist would be similar to those of Plaintiff's occupation as an industrial operator as both occupations require medium lifting, carrying, pushing, and pulling 20 to 50 pounds. (Rec. Doc. 28, P-1, at LL-0077; Rec. Doc. 27, Ex. 24, at LL-0077). Plaintiff asserts that a procedural irregularity in this case concerns Liberty Life's characterization of the motivations behind Plaintiff leaving work as an industrial operator based upon a desire to start a new career as a taxidermist when Liberty Life's own investigation allegedly concluded otherwise. (Pl.'s Br. Supp. Mot. Partial Summ. J. at 23).

As we have determined that Liberty Life's decision denying LTD benefits to Nyman was not arbitrary and capricious, we need not address Nyman's eight-week course in taxidermy in connection with an alleged intention to change careers and begin operating his own taxidermy business.